DeSISTO COLLEGE, INC. and Loren
E. Horner, Plaintiffs,

v.

The TOWN OF HOWEY-IN-THE-
HILLS, Thomas P. Line, in his individ-
ual capacity, and Paul Mazade, in his
individual capacity, Defendants.

No. 87-1-Civ-Oc-14.

United States District Court,
M.D. Florida,
Ocala Division.

Jan. 23, 1989.

Roderick MacLeish, Jr., Fine & Ambrogne, Exchange Place, Boston, Mass., Stephen H. Durant, Martin, Ade, Birchfield & Johnson, P.A., Jacksonville, Fla., for plaintiffs.

Keith R. Mitnik and John M. Robertson, Robertson, Williams, Mitnik & McDonald, P.A., Orlando, Fla., for defendants.

OPINION AND ORDER [1]

SUSAN H. BLACK, District Judge.

I. *Introduction*

Howey-in-the-Hills is a small town in Central Florida, approximately forty miles northwest of Orlando. The town is sixteen blocks long from north to south and four blocks wide from east to west. It has a population of some 650 residents. The town governs itself through a Mayor, Town Council, Zoning Commission, and other agencies. The town controls land use and development within its borders through its power to zone. The Town of Howey-in-the-Hills [hereinafter "Howey-in-the-Hills," "Howey," or "town"] is one of the defendants in this case.

Various educational institutions have for many years used property in the town. One of these institutions, located on a forty-one acre tract of land on the southern border of the town, has been a privately owned and operated high school. In 1980, Michael DeSisto and Will Roberts through a partnership bought the high school campus. They leased the campus to the DeSisto School [hereinafter "DeSisto School" or "DeSisto High School"], a high school for learning disabled students.

In 1986, DeSisto and Roberts through their partnership purchased property for the use of a second educational institution in Howey-in-the-Hills. This second educational institution was the DeSisto College, a college serving learning disabled students. DeSisto College, Inc. [hereinafter "DeSisto College" or "College"] is one of the plaintiffs in this case.

The town at first accepted and even promoted the creation of a college for the learning disabled. When the College purchased residential homes in areas not adjacent to the DeSisto High School, the town withdrew its support for the DeSisto College. The town discovered that certain college uses in residentially-zoned areas violated its Zoning Ordinance. The town also promulgated new ordinances to more closely regulate the function of colleges in residentially zoned areas.

DeSisto College and Loren E. Horner, a student at the College, sue the town and various government officials under 42 U.S. C. § 1983 and the fourteenth amendment's equal protection and due process clauses. DeSisto College wishes to secure the right to use residential property without restriction anywhere within the town's boundaries. Plaintiff Horner wishes to safeguard the College's operations in Howey to prevent her loss of DeSisto College's "unique educational and treatment program." [2]

If this case went to trial, the plaintiffs would attempt to prove that the defendant

---

1. This case came on to be heard on the Motion Of The Plaintiff, Desisto College, Inc. For Partial Summary Judgment, filed May 18, 1988; the Motion of The Plaintiff, Desisto College, Inc., For Partial Summary Judgment On Count V Of the Fourth Amended Complaint, filed July 22, 1988; and Defendants' Motion For Summary Judgment, filed on September 22, 1988. The parties filed timely responses in opposition to each other's motions. The Court heard oral argument on November 18, 1988.

2. Complaint ¶ 148. This Court does not address Horner's standing to assert her claims in light of the Court's disposition of the College's claims. The Court will assume, without deciding, that Horner has such standing.

town opposed the College and used its powers to exclude it from the town based on irrational fear and prejudice towards learning disabled students. The town would attempt to prove that Michael DeSisto was no more than a businessman trying to establish a business in Howey in the cheapest possible way, by converting residences into college facilities rather than by building on vacant land from the ground up. Although the Court finds that the parties genuinely dispute each of these extreme factual contentions, neither of these facts if established are material to this case. The Court finds from the facts that are not genuinely disputed that summary judgment is appropriate.

The Court will first review the procedural history of this case. The Court will then summarize background facts as they appear from the record and specify the standard of review on a motion for summary judgment. Finally, the Court will analyze plaintiffs' claims.

## II. *Procedural History*

The present plaintiffs along with a party who is no longer a plaintiff, Keith Murphy, filed their original Complaint in this action on January 2, 1987. The original Complaint named as defendants Thomas P. Line, Arthur Pratt, Alan B. Mills, Jr., Rodney T. Griffin, individually and in their capacity as members of the Zoning Commission of Howey-in-the-Hills, Paul Mazade, John P. Purser, III, Carlin Washo, individually and in their capacity as members of the Town Council of Howey-in-the-Hills.

Plaintiffs voluntarily filed an Amended Complaint on January 15, 1987. The First Amended Complaint named the same defendants as the original Complaint with the addition of the Town Of Howey-in-the-Hills. On January 29, 1987, defendant Thomas P. Line filed a Motion To Dismiss First Amended Complaint. On March 17, 1987, the Court granted the motion as to Count III, but denied the motion as to Counts I and II. The Court stated that "plaintiffs [had] alleged sufficient facts to state the causes of action for violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution." The motion did not raise and the Court did not address questions of immunity of the individual defendants.

Plaintiffs filed the Second Amended Complaint on July 10, 1987. The Second Amended Complaint named the same defendants as the First Amended Complaint. Keith Murphy was not included as a plaintiff in the Second Amended Complaint. The defendants filed various motions to dismiss the Second Amended Complaint. In an order dated November 10, 1987, the Court granted the motions to dismiss on the grounds that the Second Amended Complaint sought to hold the individual defendants personally liable for their legislative conduct for which the individuals were absolutely immune. The Court gave plaintiffs leave to file an amended complaint "eliminating any causes of action against the defendants in their individual capacities based on the defendants' legislative activities." November 10, 1987, order at 16. In order to clarify plaintiffs' claims against each defendant and to distinguish the claims from one another, the Court further ordered plaintiffs to plead each count and the facts supporting each count separately, to plead separate counts for each defendant, and to plead counts based on defendants actions in their individual capacities separately from counts based on defendants' actions in their official capacities. *Id.* at 15–17.

On December 7, 1987, the plaintiffs filed their Third Amended Complaint. The Third Amended Complaint included the same defendants as the Second Amended Complaint with the exception of Carlin Washo and John P. Purser III. The Third Amended Complaint further named Paul Mazade in his capacity as Mayor of Howey. The plaintiffs failed, however, to plead each count and the facts supporting each count separately, to plead separate counts for each defendant, and to plead counts based on defendants' actions in their individual capacities separately from counts based on defendants' actions in their official capacities. On April 1, 1988, the Court

granted defendants' motions to dismiss the Third Amended Complaint for violation of the Court's order of November 10, 1987.[3] The Court gave plaintiffs leave to file a Fourth Amended Complaint and gave plaintiffs further instructions in pleading.

Plaintiffs filed the Fourth Amended Complaint on April 20, 1988. The defendants listed in the Fourth Amended Complaint were the same as those in the Third Amended Complaint with the exception of Alan B. Mills. The plaintiffs withdrew the claims against defendants Arthur W. Pratt and Rodney T. Griffin by stipulation on May 6, 1988. Defendants once again filed a motion to dismiss. In light of counsels' representations as to the law and the fact that discovery in the case had terminated on June 29, 1988, the Court summarily denied the motion to dismiss stating that the issues would be more appropriately addressed on a motion for summary judgment.

Defendants filed their motion for summary judgment at bar on September 22, 1988. Plaintiffs filed their own motions for summary judgment on Counts IV and V on May 18, 1988, and July 22, 1988, respectively. The parties filed timely responses and replies. The Court heard oral argument on November 18, 1988.

### III. *Background Facts*

The Court has carefully reviewed the pleadings, affidavits, exhibits, depositions, memoranda, transcript of oral argument on the instant motions for summary judgment, and the file in this case as a whole. Pursuant to Fed.R.Civ.P. 56 and for the purpose of summarizing the record, the Court will list various background facts as they appear on the record. In listing facts, the

Court will resolve all genuinely disputed factual questions in plaintiffs' favor. The inclusion of facts in the statement of facts does not indicate that those facts listed are material pursuant to Fed.R.Civ.P. 56. The Court's discussion of materiality is encompassed in the Court's analysis of the substantive law. Furthermore, the inclusion of various facts is not a finding that the defendants could not establish different facts if this case went to trial.

#### A. The Parties

1. This is an action pursuant to 42 U.S. C. § 1983, brought by a college for the learning disabled and one of its students. The defendants are Howey-in-the-Hills and two town officials who are sued in their individual capacities. The Complaint seeks declaratory and injunctive relief. Pretrial Stipulation, Stipulated Fact 1.

2. Plaintiff DeSisto College is a Florida not-for-profit corporation. The College is located in Howey-in-the-Hills, Florida. The College was temporarily licensed by the Florida State Board of Independent Colleges and Universities in March, 1986, and has operated under that temporary license since the College commenced classes on September 8, 1986. Pretrial Stipulation, Stipulated Fact 2 & 7. Appendix To Motion For Preliminary Injunction, Exhibit B, Affidavit of Marsha Glines ¶ 10 [hereinafter "First Affidavit of Marsha Glines"].

3. Plaintiff Loren E. Horner, is a student at DeSisto College. Affidavit of Loren Horner ¶¶ 1–4. Plaintiff Loren E. Horner suffers from emotional difficulties which impair her cognitive functioning. First Affidavit of Marsha A. Glines ¶ 7.

4. Defendant Thomas P. Line [hereinafter "Line"] is the Chairman of the Zoning

---

**3.** The Court also granted a motion for sanctions against plaintiffs' counsel pursuant to Fed.R. Civ.P. 11 for signing the Second Amended Complaint without having performed a reasonable inquiry into the law of legislative immunity, for heedlessly including individual defendants in the Second Amended Complaint in a "shotgun approach," and for signing the Third Amended Complaint without due regard to the Court's instructions in the November 10, 1987, order. The Court cited various cases demonstrating that had plaintiffs conducted reasonable research, they would have discovered that a mem-

ber of a town council is absolutely immune from liability based on conduct in furtherance of the member's duties. *See Espanola Way Corp v. Meyerson,* 690 F.2d 827, 829 (11th Cir.1982), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1193 (5th Cir.1981); *Universal Amusement Co. Inc. v. Hofheinz,* 616 F.2d 202, 205 (5th Cir.1980). The Court has further clarified the broad scope of legislative conduct in the area of zoning legislation and zoning enforcement *infra. See infra* notes 18–22 and accompanying text.

Commission of the town and lives in Howey. Plaintiffs sue Line in his individual capacity. Pretrial Stipulation, Stipulated Fact 3.

5. Defendant Paul L. Mazade [hereinafter "Mazade"] is a member of the Town Council of Howey as well as Howey's Mayor. Mazade also lives in Howey. Defendant Mazade is sued in his individual capacity. Pretrial Stipulation, Stipulated Fact 4.

6. Defendant Town of Howey-in-the-Hills is a Florida municipal corporation. Pretrial Stipulation, Stipulated Fact 5. The town is located approximately forty miles northwest of Orlando and has a population of approximately 650 people. Pretrial Stipulation, Stipulated Fact 6; First Affidavit of Marsha Glines ¶ 2. The town is sixteen blocks long from north to south, and four blocks wide from east to west. Map of Howey, Comprehensive Land Use Development Plan at 1–3, filed June 13, 1988; Map of Howey, Plaintiff's Exhibit 19.

B. Educational Institutions At Howey

7. DeSisto College was not the first educational institution based in Howey. Until 1978, the Howey Academy operated as a private high school in Howey. During the 1970's, the student population at the Academy was approximately 400 students. The Academy's students were not handicapped and the Academy operated until its closing without interference from town officials. In 1980, C.V. Griffin, the owner of the Academy, sold the Academy's campus to the LaMancha Partnership, a partnership whose general partners are A. Michael DeSisto [hereinafter "Michael DeSisto" or "DeSisto"], and Will Roberts. Fourth Amended Complaint ¶ 13; Defendant's Answer ¶ 13; Roberts, 8/12/87, at 51, 56–59.[4]

8. DeSisto College was not the first educational institution in Howey formed by Michael DeSisto to serve learning disabled students. In February, 1980, the DeSisto School, a high school for learning disabled students, first began operations on the grounds of the former Howey Academy

and surrounding properties. The DeSisto School, also known as "DeSisto Howey" or the "DeSisto High School," is situated on State Route 19 in the southern section of the town. DeSisto Howey is one of three educational institutions founded by Michael DeSisto. In addition to DeSisto Howey and DeSisto College in Howey, Michael DeSisto operates the DeSisto School in Stockbridge, Massachusetts. DeSisto Howey continues to operate legally in Howey without opposition from Howey. DeSisto Howey is not a party to this litigation. The campus of DeSisto Howey, like the campus of the Academy, is comprised of a forty-one acre tract of land with numerous school buildings, including classrooms, dormitories and a gymnasium. First Affidavit of Marsha Glines ¶ 2. DeSisto Howey has had a student population in excess of 100 students.

9. DeSisto College is the first college that has operated in Howey. DeSisto College serves students who live both in and out of Howey, many of whom drive. Second Supplemental Affidavit of Marsha Glines ¶ 7. The students of DeSisto College are older than high school students. Many are of drinking age. Various professionals, such as psychologists, psychiatrists and special education teachers, have identified DeSisto College students at various times as emotionally disturbed or educationally handicapped. First Affidavit of Marsha Glines ¶ 3.

10. DeSisto College shares many characteristics with traditional colleges. For example, DeSisto College contemplates the establishment of classrooms, dormitories, faculty housing, administrative offices, a library, day-care facilities for faculty, a testing lab, a computer center, a visual arts studio, a gymnasium, laboratory space, a dance studio, a student services center, and therapy-related facilities. Second Supplemental Affidavit of Marsha Glines ¶¶ 6, 16; First Affidavit of Marsha Glines ¶ 14; Glines at 98–99.

---

**4.** Deposition testimony shall be cited by reference to the person's name, page of the deposition, and the lines on the page if applicable. If there exists more than one deposition of any

person, that will be indicated either by including the date of the deposition after the deponent's name or by including a roman numeral after the deponent's name.

11. By virtue of its function and layout, DeSisto College causes greater movement of persons and automobiles than ordinary residential owners of property in Howey. DeSisto College also has greater parking requirements than ordinary residential owners of property in Howey. Parking requirements and the movement of persons in residential areas would grow as the College increased in size to its projected size of 160 students or beyond. First Affidavit of Marsha Glines ¶¶ 6 & 15; Second Supplemental Affidavit Of Marsha Glines ¶ 7. Such movement of persons and automobiles must by necessity cause greater noise than would otherwise exist in residential areas. Furthermore, present operations of DeSisto College and its planned operations are more intensive uses of property than ordinary residential use of property.

### C. Acquisition Of Property By DeSisto College

12. In the spring of 1985, Michael DeSisto hired Marsha Glines to serve as Executive Director of the DeSisto College Project. The purpose of the project was to initiate steps to acquire property and hire faculty and staff for a college which was to serve learning disabled students. Second Supplemental Affidavit of Marsha Glines ¶ 2.

13. By September, 1986, the College used or occupied the following property in Howey: 1) a classroom and dining room facility located at 507 South Palm Avenue, 2) a dormitory building, called the "transition house," located at 509 South Palm Avenue, 3) a single-family house at 110 South Palm Avenue, 4) 411 South Palm Avenue, 5) 308 South Palm Avenue, 6) 703 North Lakeshore Boulevard, and 7) 800 North Palm Avenue as the residence and office of Marsha Glines. All of these facilities are located in Howey's residential zoning districts. Second Supplemental Affidavit of Marsha Glines ¶¶ 3, 6, 8–9.

14. As with the property used by DeSisto Howey, all of the property used by the College prior to September, 1986, with the exception of the president's residence, was located in the southern section of the town. Affidavit of Ronald Glines ¶ 4. Defendants Mazade and Line, together with other past and present town officials, reside in the northern section of Howey. Affidavit of Ronald Glines, Exhibit A. The town is, however, only sixteen blocks long from north to south, and four blocks wide from east to west. Map of Howey, Comprehensive Land Use Development Plan at 1–3, filed June 13, 1988; Map of Howey, Plaintiff's Exhibit 19.

15. Marsha Glines first occupied the property at 800 North Palm Avenue in December, 1985. From that time to the present, that property, in addition to serving as Glines's residence, has served as one of the administrative offices first of the DeSisto College Project and subsequently for its successor, DeSisto College, Inc. Second Supplemental Affidavit of Marsha Glines ¶ 6.

16. On September 8, 1986, the LaMancha Partnership acquired property at 703 North Lakeshore Boulevard. Pretrial Stipulation, Stipulated Fact 9. Sometime thereafter in early September, 1986, the College entered into a lease of the property at 703 North Lakeshore Boulevard. Second Supplemental Affidavit of Marsha Glines ¶¶ 8–9.[5]

17. On August 22, 1985, Marsha Glines, together with a real estate broker from Howey, Louisa Wrobel [hereinafter "Wrobel"], appeared at a meeting of the Howey Zoning Commission. Wrobel at 17, ln. 15. Wrobel had filed a request that the College be permitted to use the property. First Affidavit of Marsha Glines ¶ 9. Two former Mayors of the town, Fletcher Bishop and Sam Adams [hereinafter "Adams"], also attended the meeting. Bishop at 120, ln 13 to 126, ln. 19. Glines also stated that the property would be used for conference rooms or administrative offices for the Col-

---

**5.** The defendants vigorously dispute this fact because of plaintiffs inability to present a written lease and Marsha Glines's lack of personal knowledge concerning the lease. As with the rest of the facts in the Court's statement of facts, the Court shall assume that for purposes of this motion, and for no other purpose, that the plaintiffs had a lease on this property.

lege, and for counseling purposes. Wrobel at 17, ln. 25. Affidavit of Bishop ¶ 5.

18. In response to Marsha Glines's statements, Edmond Stachowski, then-chairman of the Zoning Commission, expressed his opinion that the property could not be used for "college purposes." Wrobel at 18, ln. 15; Bishop at 120, ln. 18. At that point, Wrobel interjected and explained to Chairman Stachowski that the property was located in an R–1 district which permitted "school" use. Wrobel at 18, ln. 21; Bishop at 120, ln. 19.

19. After some discussion among the committee members, Chairman Stachowski then changed his opinion and agreed that the proposed use was a permitted one under the Howey Zoning Ordinance. Bishop at 122, ln. 19; Wrobel at 21, ln. 11. Chairman Stachowski said that it was not necessary for the College to file an application with the Zoning Commission for authorization to use the property. Wrobel at 22, ln. 5; Bishop at 123, ln. 9; Affidavit of Bishop ¶ 6. Adams recounted similar facts. Affidavit of Adams ¶¶ 4–5; Adams at 17, ln. 12–24.[6]

20. On March 24, 1986, the Florida State Board of Independent Colleges and Universities granted temporary licensure to DeSisto College. Pretrial Stipulation, Stipulated Fact 7. The College decided to hold a party in celebration of its licensure. Invitations were sent to a number of the defendants and the party was, in fact, attended by defendants Line and Mazade. Line I at 231, ln. 23.

21. At various times, Marsha Glines spoke to various community groups concerning the College, including the Town of Howey Men's Club and the Town of Howey Women's Civic and Garden Club. Deposition of Marsha Glines at 98, ln. 18–25. By April, 1986, it was common knowledge in the town that the College would be opening the following fall. See, e.g., Mazade I at 121, ln. 25 to 122, ln. 9; Line I at 234, ln. 5–10; see also Warner II at 42, ln. 18–22.

22. In May, 1986, at the suggestion of Mazade, then a member of the Town Council, Mayor Fletcher Bishop decided to schedule a "Mayor's Forum" to discuss the opening of the College. Pretrial Stipulation, Stipulated Fact 8; Bishop at 107, ln. 4 to 108, ln. 3–7. The Mayor's Forum, which was held in June, 1986, was announced at a meeting of the Town Council and was publicized in the local newspaper, the *Howey Herald*. First Affidavit of Marsha Glines ¶ 8.

23. The College participated in the "Mayor's Forum" on June 16, 1986. The forum was attended by a number of public officials of the town, including then-Mayor Fletcher Bishop and approximately 50 Howey residents. At the forum, Marsha Glines distributed copies of the College's catalogue. She also answered questions from town residents, including questions as to where students would be living. Pretrial Stipulation, Stipulated Fact 17; Second Supplemental Affidavit of Marsha Glines ¶ 7.

24. Glines stated that, as a condition of the College's licensure, it would have to grow to approximately 160 students within four years.[7] There is, however, nothing in the record to indicate that there is any upper limit on the number of students that DeSisto College could or would in the future enroll. Glines stated that some stu-

---

6. The Court notes that the defendants vigorously dispute plaintiffs' representations concerning what actually happened at this meeting. See Defendant's Statement Of Facts at 3, filed November 28, 1988. In addition, defendants argue that there is no evidence in the record demonstrating that this determination was an advisory opinion as to the interpretation of Section 6(1)(A)(2) of the 1967 Zoning Ordinance with binding prospective application as to any and all college uses in all residential areas of Howey. See Stachowski at 31–44. The Court notes that these factual disputes are not material to the case.

7. The defendants dispute this fact. Although defendants concede that this was Glines's statement, defendants argue that this was not a licensure requirement and that the plaintiffs knew that it was not. See Deposition of Sandra Knight, at p. 11, ln. 24 to p. 12, ln. 9; p. 62, ln. 4–8; Appendix 21 to Defendant's Motion For Summary Judgment. See also Defendants' Notice Of Objection To Plaintiffs' Proposed Finding Of Fact at 5. The Court finds this factual dispute is not material in light of the Court's disposition of this case.

dents would require close supervision and would reside in the College's dormitory referred to as the "transition house," a dormitory building which presently accommodates approximately 24 students and is located on the west side of State Route 19 opposite the DeSisto High School. Glines explained that other College students would be residing in private homes within the community or in private homes outside of Howey. Second Supplemental Affidavit of Marsha Glines ¶ 7; Bishop at 110, ln. 1 to 113, ln. 17.

25. On October 8, 1986, the Howey Zoning Commission approved an "Authorization for Building Permit Application" for property used by the College. This permit allowed DeSisto College to "replace garage door opening with windows and wall—remove cement driveway." Plaintiffs' Exhibit 10.

### D. Zoning In Howey Prior to December 25, 1986

26. In March, 1967, Howey adopted a Zoning Ordinance. Under the ordinance, the town was divided into four different districts, R–1, R–2, R–3 and C–1. The ordinance set forth various permitted uses. Appendix A, Zoning, Code of Ordinances of the Town of Howey-in-the-Hills, Florida, [hereinafter "1967 Zoning Ordinance"], Editor's Note at 947, Exhibit 2 to Second Supplemental Affidavit of M. Glines.

27. Until December 25, 1986, Section 6(1)(A)(2) of the 1967 Zoning Ordinance [hereinafter "Section 6(1)(A)(2)"] provided that "schools, elementary, high and private, but excluding correctional institutions" were permitted uses in R–1, R–2 and R–3 districts. This same language was contained in a Zoning Ordinance of the town which pre-dated the existence of the Academy. Zoning Ordinance, Town of Howey-in-the-Hills, Adopted December 4, 1950, Plaintiffs' Exhibit 1.

28. Under section 6(3)(A)(1) of the 1967 Zoning Ordinance, any use permitted in R–1, R–2, and R–3 districts was permitted in a C–1 district. Thus, prior to its repeal on December 25, 1986, the 1967 Zoning Ordinance permitted the use of property for "school, elementary, high, and private but excluding correctional institutions" in all areas of the town. In addition, various other uses were permitted as a matter of right in residential zoning districts until December 25, 1986, including libraries, community centers, government buildings, churches and home offices for physicians or surgeons. 1967 Zoning Ordinance, Plaintiffs' Exhibit 2.

### E. The September 29, 1986, Citation Letter

29. On September 8, 1986, Diane Brownlee, the College's admissions officer, telephoned defendant Line, and informed him that the College had leased the Lakeshore Boulevard property. Pretrial Stipulation, Stipulated Fact 10; Brownlee at 64, ln. 14 to 65, ln. 17.

30. The original purpose of the College's acquisition of the Lakeshore Boulevard property was to use it as a faculty residence and a part-time tutoring or therapy facility. Second Supplemental Affidavit of Glines ¶ 9. The property was, however, later used as a classroom. Second Supplemental Affidavit of Marsha Glines ¶ 16. Sykes at 41–42; Murphy at 34, ln. 7 to 35, ln. 21.[8]

31. Defendant Line responded to Brownlee by expressing his opposition to the College's acquisition of the property. Brownlee at 64, ln. 14 to 65, ln. 17.

32. On the same day of Brownlee's telephone conversation with defendant Line, a meeting of the Zoning Commission was scheduled. The posted agenda for the meeting was a discussion of the enforcement of the Zoning Code in the town. The meeting was scheduled to take place at 6:30 p.m. on September 8, immediately prior to a meeting of the Town Council. At the meeting, members of the Zoning Commission discussed the College's acquisition of the

---

**8.** Although Marsha Glines stated at the September 22, 1986, Zoning Commission meeting that no classes would be held at the Lakeshore Boulevard house, Second Supplemental Affidavit of Marsha Glines ¶ 13, plaintiffs apparently do not dispute the deposition testimony of Murphy and Sykes that classes were in fact held at the house.

Lakeshore Boulevard property. Warner II at 28, ln. 13 to 32, ln. 2.

33. On September 22, 1986, the Howey Zoning Commission convened its next meeting. The meeting also concerned the College's acquisition of the 703 North Lakeshore Boulevard property. The meeting was chaired by the defendant Line. Unlike most meetings of the Zoning Commission, which were sparsely attended, approximately one hundred town residents were in attendance. First Affidavit of Marsha Glines ¶ 11; Warner II at 6, ln. 13–17 & 21.

34. Ronald Glines began the meeting by making a presentation on behalf of the College. Ronald Glines served from May through October 1986, as a consultant to the College. Affidavit of Ronald Glines ¶ 1.

35. When Ronald Glines was unable to answer all of the questions posed by the audience, Marsha Glines agreed to respond to questions. She stated that no classes would be held at the Lakeshore Boulevard house and that the property would be used as a faculty residence and a study hall/therapy center between the hours of 3:30 p.m. and 5:30 p.m. The College had no plans for students to reside at the Lakeshore Boulevard house. Second Supplemental Affidavit of Marsha Glines ¶ 13; Willis, at 48, ln. 3, 18.

36. The Zoning Commission voted to refer the question of the College's use of the property to the town attorney for an opinion. Minutes Of The Meeting Of The Zoning Commission on September 22, 1986, Plaintiffs' Exhibit 11. Michael Croak was Town Counsel from 1977 to December, 1986. Croak, at 4, ln. 9–10.

37. The next meeting of the Zoning Commission was held on September 27, 1986. Prior to this time, defendant Line had met with Michael Croak. Croak at 14, ln. 3 to 15, ln. 21. The result of the defendant Line's meeting with Croak was a one-paragraph letter from Croak dated September 26, 1986. The letter addressed the question of the legality of the use of prop-erty as a "college classroom or office" in a residential zoning district and was appended to the September 28, 1986, citation letter. Plaintiffs' Exhibit 4 at 2. Croak expressed two reasons why a college classroom or office in a residential district would violate the Zoning Ordinance. Croak opined that such a use would violate the town's ordinance "establishing the districts," and would also "violate the town ordinance on building permits inasmuch as this would be a different use than as described in the original building permit issued for the property." Plaintiffs' Exhibit 4 at 2.

38. Croak did not undertake any legal research with respect to his letter of September 26, 1986. Croak at 21, ln. 4–8. Croak's opinion of September 26, 1986, was a "preliminary" one. Croak at 23, ln. 1–11. The letter reflected both Croak's own personal opinion as to the legality of the use as well as defendant Line's position that the College's use of the Lakeshore property was illegal. Croak at 17, ln. 1–9, & 36, ln. 14–15; Croak at P–1. Croak's final opinion expressing the same conclusion with some reservations as to the certainty of his interpretation of the ordinance is contained in his letter to Line dated October 27, 1986. *See* Defendant's Exhibit 1, Croak Affidavit ¶ 4.

39. At the time that Croak rendered his opinion, he was unaware of a number of facts. He did not know that the College had been occupying property in residential zoning districts since April, 1986. Croak at 25, ln. 6–11. Likewise, Croak was unaware of the August 22, 1985, meeting of the Zoning Commission. Croak at 26, ln. 16 to 28, ln. 11. He was unaware of the "Mayor's Forum" held in June, 1986. Croak at 26, ln. 11–15.[9]

40. At no time had the College represented that the property at 703 North Lakeshore Boulevard would be used for an office or for a college classroom. Second Supplemental Affidavit of Marsha Glines ¶ 15; Defendants' Exhibit 7. Although no

---

9. Defendants would argue that no reasonable inference could be drawn from Croak's lack of awareness of these facts that his interpretation of the ordinance would have been different had he known these facts. The Court finds that this factual dispute is not material to the case.

such representation was made, the property was in fact used for classroom purposes. Sykes at 41–42; Murphy at 34, ln. 7 to 35, ln. 21; Second Supplemental Affidavit of Marsha Glines ¶ 16. *See also supra* Background Facts ¶ 30.

41. At the meeting of the Zoning Commission on September 27, 1986, the members of the Commission discussed the enforcement of the Zoning Ordinance against DeSisto College in its use of the North Lakeshore Boulevard property. Commission member Patricia Warner expressed her concern that the Zoning Ordinance was not always enforced in the past. Warner at 52, ln. 8–15.[10] Defendant Line expressed his view that enforcement of zoning regulations and construction standards was especially important as applied to public assembly buildings such as colleges.

42. The Commission members, including Commission member Warner, voted unanimously to notify the owners of the North Lakeshore Boulevard property that they were in violation of the Zoning Ordinance. Minutes Of Special Zoning Commission Meeting, September 27, 1986, Plaintiffs' Exhibit 12. That college students drive automobiles, that DeSisto College in particular would have greater parking re-

quirements than an ordinary residential owner of property, that the movement of DeSisto College students and their automobiles would cause greater noise than would exist without the College being located in residential areas, and that college use is a more intensive use of property than ordinary residential use, were facts before the Zoning Commission when it voted to cite DeSisto College for violating the Zoning Ordinance.

43. On September 29, 1986, defendant Line sent a letter to Michael DeSisto, advising him that the Lakeshore Boulevard property could not be used as a "classroom, meeting house or other college uses". Defendant Line's letter to DeSisto also included a copy of Croak's letter of September 26, 1986, and a copy of the Howey Zoning Code pertaining to building permits. Plaintiffs' Exhibit 4.

### F. Ordinances 160, 161, and 162

44. In October, 1986, Croak drafted Ordinances 160, 161, and 162, for the purpose of clarifying the zoning regulations as they applied to, among other things, the legality of colleges in residential areas. Croak at 51–52, 65–66; Affidavit of Croak ¶¶ 10–11; Letter dated October 27, 1986, Plaintiffs' Exhibit 21.[11] Under Ordinance 160, vari-

---

**10.** The defendants dispute this contention.

**11.** Ordinance 160 provides as follows:
ORDINANCE NO. 160
AN ORDINANCE UNDER THE CODE OF ORDINANCES OF THE TOWN OF HOWEY–IN–THE–HILLS, LAKE COUNTY, FLORIDA, REVISING AND CHANGING CERTAIN PARTS OF APPENDIX A–ZONING, SECTION 6, SCHEDULE OF DISTRICT REGULATIONS (p. 953) BY REPEALING SUBSECTIONS (1)(A)(9) OF SECTION 6:
Appendix A–Zoning, Section 6, Schedule of District Regulations is hereby amended by, repealing the following subsections listing permitted used in R–1, R–2, and R–3 Districts, to-wit:
Section 6.
(1)(A)(2) Schools, elementary, high and private, except correctional institutions.
(1)(A)(3) Libraries, community centers, and buildings used exclusively by the federal, state, county or town government for public purposes except penal or mental institutions.
(1)(A)(4) Churches and other places of worship including Sunday School buildings.
(1)(A)(6) Parks, playgrounds and play fields if approved by the town council.

(1)(A)(9) Uses customarily incidental to any of the above uses when carried out in the same dwelling, including also home occupations such as the office of a physician, surgeon, dentist, musician, artist, or any other similar use.
a. Only a nameplate, not to exceed one square foot in area, may be attached to the house.
b. No advertising structure of any character shall be permitted; however, temporary signs, not exceeding eight (8) square feet in area, pertaining to the sale, lease or rental of building or premises may be placed in the buildable areas as defined herein.
The above listed subsections of Section 6, Appendix A–Zoning are repealed in full and henceforth are not permitted uses under Section 6, (1)–Use Regulations–R–1, R–2, R–3.
Ordinance 161 provides as follows:
ORDINANCE NO. 161
AN ORDINANCE UNDER THE CODE OF ORDINANCES OF THE TOWN OF HOWEY–IN–THE–HILLS, LAKE COUNTY, FLORIDA, ESTABLISHING REQUIREMENTS AND CONDITIONS FOR A "PFD" PUBLIC FACILITY DISTRICT.
1. PURPOSE AND INTENT
The purpose of provisions of this ordinance is to allow for the creation and establishment of a

"PFD" Public Facility Zoning District under the zoning ordinances of the Town of Howey–in–the–Hills, Florida. The "PFD" Public Facility District is to be used for those areas where special or substantial public interest uses and activities are either necessary and/or desirable.

It is further the intent of these provisions to establish "PFD" Public Facility Districts individually under approved site plans and conditions necessary to promote the general welfare and safety of the citizens, and to secure economic and coordinated land use.

2. PERMITTED USES

The following are the permitted uses in a "PFD" Public Facility District. However, the specific ordinance authorizing the establishment of a "PFD" Public Facility District related to a specific tract of land will condition the land use and operation of the function, to-wit:

a. Airports and heliports.
b. Auditoriums, stadiums, arenas, and expositions.
c. Broadcasting towers and facilities.
d. Buildings, structures, and uses operated or maintained by a body having the power of eminent domain.
e. Bus stations, railroad stations or other mass transit systems.
f. Cemeteries and crematories.
g. Community base residential facilities.
h. Churches and church schools.
i. Church camps, Boys Ranches and Girls Ranches.
j. Day care centers.
k. All educational institutions.
l. Electric power and light generating plants, electric substations, and operational centers.
m. Gas and water metering stations.
n. Hospitals, including emergency treatment centers.
o. Marinas
p. Nursing homes.
q. Parks.
r. Post offices.
s. Libraries.
t. Police and fire facilities.
u. Recreation facilities.
v. Refuse transfer stations.
w. Sanitary landfills.
x. Sewage treatment facilities, regional.
y. Tourist information centers.
z. Water withdrawal operations, regional.
aa. Any other use of a similar type nature when approved by the Town Council.

3. PROCEDURES AND SITE PLAN REQUIREMENTS

In order to establish a "PFD" Public Facility District, application must be made to the Town Council on official forms obtained from the Town Clerk, with a filing fee as required and the application shall be accompanied by a preliminary site plan drawn to an appropriate scale on paper indicating the following:

a. Project name
b. North arrow, date and scale
c. Name, address and telephone number of owner and applicant.

d. Property lines and contiguous streets.
e. Location and dimensions of all existing and proposed structures, indicating their intended use and setback distances from all property lines and centerline of roadways.
f. Existing and proposed means of vehicular ingress and egress to the property.
g. Location of offstreet parking and loading areas, showing the number of spaces and the dimensions of access aisles and driveways.
h. Location of all buffers, screens, walls and fences, indicating their heights and type of material used.
i. Location of all signs, indicating height, lighting and type of material used.
j. Location of sewer and water lines.
k. Location of solid waste containers and screening.
l. The method of handling any traffic problems, both vehicular and pedestrian, created by the proposed use.

The procedures for public notices and public hearings shall be the same as required for any change of zoning within the boundaries of the Town of Howey–in–the–Hills, Florida.

The Director of Planning, or other person designated by the Town Council, shall check compliance with the Comprehensive Development Plan as adopted. The Zoning Commission shall review the application and preliminary site plan, and after public hearing forward its recommendation and vote to the Town Council. If the recommendation is affirmative, the Zoning Commission shall also forward any and all recommended conditions regulating and controlling the particular use affirmed. The regulations and conditions shall include, but are not limited to:

a. The particular use approved.
b. Any and all performance standards, restrictions, condition requirements for the permitted used.
c. Requirements that any transfer of ownership or lease [illegible] or all of the property in question included in the transfer or lease agreement a provision that the purchaser or lessor is aware of the conditions pertaining to the particular "PFD" Public Facility District and agrees to be bound by said conditions of the ordinance authorizing the establishment of the particular "PFD" Public Facility District.

4. LOT SIZE

There is no required lot size, lot width or building heights in the "PFD" Public Facility District, but each shall be determined individually on each specific application depending on the requested land use and its potential intensity.

5. SET BACKS

All buildings and structures shall be set back not less than thirty-five (35) feet from public rights-of-way and fifteen feet from all property lines.

6. SCREENING

When the rear and/or side of the property zoned "PFD" abuts residentially zoned property

ous uses of property, including school use, were removed as permitted uses in residential zoning districts. Defendants' Exhibit 17. Defendant Line also proposed Ordinance 161, which allowed for the creation of a "public facility district" [hereinafter "PFD"] in all zoning districts of the town. Defendants' Exhibit 18. Under this ordinance, uses more intensive than a college, such as hospitals, electric plants, railroad systems, airports, and stadiums, were required to satisfy the requirements of the ordinance. Defendants' Exhibit 18. Ordinance 162 limited the number of unrelated individuals who could live in a residential home to three.

45. Croak was discharged from his position as Town Counsel in December, 1986. Croak at 62, ln. 2–7. Richard Langly was appointed as Croak's replacement on December 8, 1986. Mazade I at 212, ln. 16–22; Plaintiffs' Exhibit 28.

46. On December 1, 1986, the Town Council convened for a first reading of Ordinances 160 and 161. Plaintiffs' Exhibit 15. On December 15, 1986, the Town Council convened for a second reading of Ordinances 160 and 161, and on that date passed the two ordinances, Ordinances 160 and 161. Plaintiffs Exhibit 17. These ordinances became effective on December 25, 1986, and have remained in effect since that time. Pretrial Stipulation, Stipulated Fact 18. Ordinance 162 was adopted January, 5, 1987, and took effect on January 15, 1987. Fourth Amended Complaint ¶ 69; Defendant's Answer ¶ 69; Defendant's Exhibit 19. That college students drive automobiles, that DeSisto College in particular would have greater parking requirements than ordinary residential owners of property, that the movement of DeSisto College students and their automobiles would cause greater noise than would exist without the College being located in residential areas, and that college use is a more intensive use of property than ordinary residential use, were facts before the Town Council when it voted to enact Ordinances 160, 161, and 162.

### G. The Change Of Use Application

47. On September 29, 1986, defendant Line sent Michael DeSisto a letter which stated that the College's use of the Lakeshore Boulevard property was in violation of the town's Zoning Ordinance. Plaintiffs' Exhibit 3.

48. In an effort to resolve the matter, the College filed a "change of use" application on November 25, 1986. In the application, the College contended that authorization from the Commission was unnecessary because the Zoning Commission had no authority to deny a landowner the right to use his property for a use which was already permitted in a particular zoning district. The College's application was filed with a reservation of rights. Plaintiffs' Exhibit 16.

---

or property having a residential use, the property shall, as a condition or requirement of the "PFD" zoning, be required to provide screening along the rear and/or side property line to be of height and of material as determined individually on each application.

This ordinance shall take effect upon its passage according to law.

ATTEST:

| | |
| --- | --- |
| TOWN CLERK | MAYOR |

PASSED BY VOTE OF THE COUNCIL AT FIRST READING. DATE:
DECEMBER 1, 1986
PASSED BY VOTE OF THE COUNCIL AT SECOND READING. DATE:
DECEMBER 15, 1986

ORDINANCE NO. 162
AN ORDINANCE UNDER THE CODE OF ORDINANCES OF THE TOWN OF HOWEY–IN–THE–HILLS, LAKE COUNTY, FLORIDA, REVISING AND CHANGING THE DEFINITION OF FAMILY AS SET FORTH IN APPENDIX A–ZONING, SECTION 2. DEFINITIONS.

Appendix A–Zoning, Section 2, Definitions "Family" is hereby amended by repealing the following definition, to-wit:

FAMILY: Any number of individuals, related by blood or marriage living together as a single housekeeping unit, and/or no more than six (6) individuals, not related by blood or marriage shall occupy a single family dwelling.

And is hereby further amended by enacting and adding the following definition, to wit:

FAMILY: Any number of individuals, related by blood or marriage, living together as a single housekeeping unit, or no more than three (3) individuals, not related by blood or marriage living together as a single housekeeping unit.

This ordinance shall take effect upon its passage according to law.

49. A hearing on the application was held before the Zoning Commission on December 11, 1986. Richard Langley represented the Zoning Commission. Plaintiffs' Exhibit 23. The College's application to use the 703 Lakeshore Boulevard property for college purposes was denied by the Zoning Commission. Plaintiffs' Exhibit 16.[12]

H. Citations of December 19, 1986

50. The Howey Mansion is located on approximately 15 acres of land in the northern section of Howey. Second Supplemental Affidavit of Marsha Glines ¶ 18.

51. On December 19, 1986, defendant Line met with defendant Mazade at the offices of the Line Construction Company in Tavares, Florida. Mazade I at 171, ln. 23 to 172, ln. 8. During their meeting, a series of "citation" letters were typed by Line's secretary on town stationery on behalf of Mazade. Mazade I at 172, ln. 12–14. Plaintiffs' Exhibit 5. That college students drive automobiles, that DeSisto College in particular would have greater parking requirements than ordinary residential owners of property, that the movement of DeSisto College students and their automobiles would cause greater noise than would exist without the College being located in residential areas, and that college use is a more intensive use of property than ordinary residential use, were facts before the Mayor and the Chairman of the Zoning Commission when they decided to cite DeSisto College for violating the Zoning Ordinance.

52. In one letter, defendant Mazade cited the College for violating the use provisions of the Zoning Ordinance with respect to the College's use of the Mansion. Plaintiffs' Exhibit 5 at 5–6. The letter states that "colleges are not allowed under this use regulation in the Town of Howey-in-the-Hills." *Id.* Mazade also cited the College for using the Mansion property for a use other than the use set forth in the Mansion's original building permit. *Id.* Finally Mazade cited the College for having more than six unrelated individuals living in the Mansion. *Id.*

53. Town Council member Joyce Powers wrote a letter to Mayor Mazade calling for a Town Council meeting on December 29, 1986, to discuss among other things the December 19, 1986, citation of the College. Plaintiffs' Exhibit 29. Mazade called a special meeting of the Town Council for December 29, 1986. Over one hundred residents attended the meeting. Pretrial Stipulation, Stipulated Fact 14.

54. Howey government officials have not enforced Howey's Zoning Ordinances against all persons who have in the past been in violation of the zoning ordinances.[13]

I. Articulated Purposes For Governmental Actions[14]

55. Michael Croak, the attorney who drafted Ordinances 160, 161, and 162, stated in his affidavit that based on his personal observations, the enforcement of the zoning code against Desisto College was based on concern for protecting the residential character of the town. *See Affida-*

---

12. Plaintiffs allege that the denial of the change of use violated their constitutional rights. *See* Complaint ¶ 162. Plaintiffs have not, however, requested a declaration as to the unconstitutionality of the change of use procedure in any of the prayers of the Fourth Amended Complaint. The Court notes that the denial of a change of use permit would be analyzed in the same manner as the zoning legislation and the enforcement of the zoning legislation.

13. Defendants dispute this factual finding. The Court will assume the truth of plaintiffs' allegations for purposes of this motion. The Court will, however, pause to note that it does not violate equal protection or due process when the government chooses to solve a small aspect of a larger problem and does not act to solve the

larger problem. Furthermore, enforcement of the Zoning Ordinances against parties who are not similarly situated as plaintiffs will not violate either equal protection or due process. *See infra* notes 31 & 32 and text following note 32.

14. The Court specifically does not find that the following facts are the actual purposes for the promulgation of Ordinances 160, 161, and 162 and enforcement of the zoning ordinances against DeSisto College of the various government officials. The following facts demonstrate the articulated purposes of the governmental actions of various individuals both before and after the initiation of this lawsuit. The Court finds that there is no genuine issue of fact that these purposes were articulated.

vit of Michael Croak ¶ 9, Appendix To Defendants' Memorandum In Support Of Motion For Summary Judgment, Exhibit 1. Croak stated that the residential character of the town would benefit from maintenance of a low level of vehicular traffic, Croak at 72, and the exclusion of boarding houses. Croak at 68.

56. Similarly, defendant Thomas P. Line suggested at the October 27, 1986, meeting of the Zoning Commission that the enforcement of the Zoning Ordinance against the College promoted the "privacy, tranquility, lifestyle, and the peaceful and quiet atmosphere." *See* Minutes Of Zoning Board Of October 27, 1986, Appendix To Defendants' Memorandum In Support Of Motion For Summary Judgment, Exhibit 16 at page m/z 28, Appendix In Support Of Defendants' Motion For Summary Judgment, Exhibit 15. Line made similar remarks in his deposition. Line at 129, ln. 19–23. Other Howey government officials expressed similar concerns. *See* Pratt at 236, ln. 16–24, 239, ln. 4–7; Griffin at 198, ln. 25 to 199, ln. 25; Washo at 103, ln. 20 to 104, ln. 3, 114, ln. 16–25, 115, ln. 6–14, 129, ln. 11–23.

57. A seventeen-page petition dated November 10, 1986, indicates that the signatories wished to "restrict R–1, R–2, and R–3 districts for private single family residences only, to maintain our town's serenity ... [and] to preserve the residential character of [their] neighborhood." *See* Petition, Appendix To Defendants' Memorandum In Support Of Motion For Summary Judgment, Exhibit 20.

58. Plaintiffs' legal advisors, the Director of Desisto High School, and Michael DeSisto recognized at least the articulation of the purpose of preserving the residential character of Howey. *See* DeSisto, 8/21/87, at 10, ln. 17 to 13, ln. 11, 93 ln. 6–12; Doktor, at 10, ln. 22 to 11, ln. 14; Plaintiffs

Exhibit 44, Memorandum From M. Morley to H.D. Robuck, legal advisors of DeSisto College, at 3–4.

 59. A number of citizens and government officials of Howey made derogatory statements at public gatherings, public meetings, private meetings, and in newspaper interviews concerning DeSisto College and the students at the College.[15]

## IV. *Standard Of Review*

A district court's review of a case on a motion for summary judgment is governed by Fed.R.Civ.P. 56. A moving party discharges its burden on a motion for summary judgment by "showing" or "pointing out" to the district court that there is an absence of evidence to support the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Fed.R.Civ.P. 56 permits the moving party to discharge its burden with or without supporting affidavits and to move for summary judgment on the case as a whole or on any claim. 477 U.S. at 325, 106 S.Ct. at 2554. When a moving party has so discharged its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" 477 U.S. at 324, 106 S.Ct. at 2553.

The district court must enter summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. at 2552; Fed.R.Civ.P. 56(c). Whether or not the

---

**15.** The defendants hotly contest this factual finding and the admissibility of any newspaper articles that plaintiffs have introduced to support it. In fact, the defendants ask the Court to consider other newspaper articles showing that Michael DeSisto is motivated more by profit than serving learning disabled students. The Court will, for the purpose of this motion, assume the truth of plaintiff's allegations. The Court finds, *infra* at Section V,C,1, that the parties' motivations are not material to this case. The Court finds that rational basis review under the equal protection and due process clauses is an objective one and not a subjective one. Under the objective test of whether or not legislation or enforcement is supported by a rational basis, the motivations of the lawmakers and enforcers are not material to the question whether or not legislation is otherwise supported by a rational basis.

moving party has met its burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law, requires the court to draw inferences from the evidence as viewed in the light most favorable to the nonmoving party, and to resolve all reasonable doubts in that party's favor.

The Eleventh Circuit Court of Appeals explained the reasonableness standard in *WSB–TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir.1988):

> In deciding whether an inference is reasonable, the court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." ... The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts.... When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

842 F.2d at 1270 (citations omitted).

Fed.R.Civ.P. 56(c) requires the district court to deny a motion for summary judgment if the court finds that there exists a genuine issue for trial. What constitutes a "genuine issue for trial" was addressed by the Supreme Court in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In *Anderson*, the Court stated that "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." 477 U.S. at 248, 106 S.Ct. at 2510. The Court further stated that the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." 477 U.S. at 251–52, 106 S.Ct. at 2511–12.

## V. *Plaintiffs' Fourth Amended Complaint*

The Plaintiffs' Fourth Amended Complaint seeks *inter alia* [16] the following relief: A) a declaration that under Florida law the meaning of the word "school" as it appears in the use regulations of the 1967 Zoning Ordinance includes the Plaintiff College's use, *see* Count V; B) a declaration that Ordinance 161 is unconstitutionally vague on its face under the substantive due process clause of the fourteenth amendment, *see* Count IV; C) a declaration that the defendants' citation of the College on September 29, 1986, and December 19, 1986, for violating Section 6(1)(A)(2) of the Town's 1967 Zoning Ordinance violates the College's substantive due process rights and both the College's and Loren Horner's equal protection rights under the fourteenth amendment, *see* Counts I, II, III, VI, VII, VIII, IX, X, and XI; D) a declaration that Ordinance 160 violates Desisto College's substantive due process rights and both the College's and Loren Horner's equal protection rights under the fourteenth amendment, *see* Counts I, VI, VII; E) a declaration that the town's passing Ordinances 161 and 162 violated plaintiffs' equal protection rights under the fourteenth amendment, *see* Counts VI, VII.

The Court will first determine whether or not the term "school," as used in the 1967 Zoning Ordinance, includes "college" use. The Court will then determine whether or not Ordinance 161 is unconstitutionally vague on its face. Finally, the Court will address the equal protection and substantive due process claims.

### A. The Term "School" In Section 6(1)(A)(2) Of The 1967 Zoning Ordinance

The parties have each filed motions for summary judgment on Count V of the

---

**16.** Plaintiffs also seek an injunction against the enforcement of the various zoning ordinances against DeSisto College, an injunction against the town's reversal of its "earlier determination to the effect that college use was permissible in a residential zoning district," an injunction preventing the town from "interfering" with the College's use and occupation of various parcels

of land, an order that the Howey–in–the–Hills Zoning Commission and Town Council be placed in receivership, attorneys' fees and costs of suit, and "further relief as may be appropriate." It is unnecessary for the Court to analyze such relief in light of the Court's disposition of the claims for declaratory relief listed in the text.

Fourth Amended Complaint. They each agreed at the hearing on the motions for summary judgment that the Court did not need to resolve any factual issues to rule on the motions and that the motions raised only questions of law. This Court agrees that statutory construction is a question of law. *See Devin v. Hollywood*, 351 So.2d 1022, 1026 (Fla. 4th DCA 1976).

The issue raised by Count V is whether or not the term "school" in Section 6(1)(A)(2) of the 1967 Zoning Ordinance includes colleges. Plaintiffs argue that colleges are schools under the ordinance. Defendants argue that colleges are not schools under the ordinance. The Court will first outline Florida's law of statutory construction applicable to this case and then apply that law in construing Section 6(1)(A)(2).

The goal of statutory interpretation is to determine legislative intent. *See Tyson v. Lanier*, 156 So.2d 833, 836 (Fla.1963). Where legislative intent is not clear, however, Florida Courts have designed rules of construction to aid in the search for legislative intent. *See Lanier v. Bronson*, 215 So.2d 776, 778 (Fla. 4th DCA 1968). These rules of construction are equally applicable to the construction of municipal ordinances as to other statutes. *See Carroll v. City of Miami Beach*, 198 So.2d 643, 646 (Fla. 3d DCA 1967).

■ It is a general principle of statutory construction, well-established in Florida's jurisprudence, that the mention of one thing implies the exclusion of another, *expressio unius est exclusion alterius. See Towerhouse Condominium, Inc. v. Millman*, 475 So.2d 674, 676 (Fla.1985); *Thayer v. State*, 335 So.2d 815, 817 (Fla.1976); *Ideal Farms Drainage Dist. v. Certain Lands*, 19 So.2d 234, 239 (Fla.1944). Therefore, where a statute enumerates the things on which it is to operate, the statute will ordinarily be construed as excluding from its operation all those things not expressly mentioned. *Id.*

■ Another principle of statutory construction is that words take meaning based on their context or their association with other words in the statute, *noscitur a sociis. See State ex rel. Triay v. Burr*, 84 So. 61, 73–75 (Fla.1920); *Orange County Audubon Soc. v. Hold*, 276 So.2d 542, 543 (Fla. 4th DCA 1973). Where one of the enumerated terms is a general one, it may be restricted to a narrower sense or less general meaning by the context in which it is used. *See Carraway v. Armour & Co.*, 156 So.2d 494, 495 (Fla.1963); *Ex parte Amos*, 112 So. 289, 293 (Fla.1927). If the legislature excludes a thing by omission from the statute, a court may not in the process of construction supply the omission. *See Brooks v. Anastasia Mosquito Control Dist.*, 148 So.2d 64, 66 (Fla. 1st DCA 1963).

■ The final principle of statutory construction applicable to this case requires a court 1) to presume that the legislature puts every provision in a statute for a purpose and 2) to construe the statute to give each of the statute's provisions effect, *ut res magis valeat quam pereat. See Forehand v. Board of Public Instruction*, 166 So.2d 668, 672 (Fla. 1st DCA 1964). A construction that would leave any part of the language in a statute without effect should be rejected. *See Vocelle v. Knight Bros. Paper Co.*, 118 So.2d 664, 667 (Fla. 1st DCA 1960).

■ Section 6(1)(A)(2) of the 1967 Zoning Ordinance provides in pertinent part as follows:

Section 6. Schedule of district regulations—Use regulations; height and area regulations; prohibited regulations.

(1) *Use regulation–R–1, R–2, R–3 districts.*

(A) In the R–1 and R–2 and R–3 single-family districts, no building or land shall be used and no building shall hereafter be erected, constructed, reconstructed, structurally altered, repaired or moved unless otherwise provided in this ordinance, except for one of the following uses:

. . . .

(2) Schools, elementary, high, and private, except correctional institutions.

Code of Ordinances of the Town of Howey-in-the-Hills, Florida, Appendix A, Zoning, Section 6(1)(A)(2).

The Court finds that the term "school" is an ambiguous term. It is unclear whether or not the term does or does not include college in its meaning. The parties have presented the Court with numerous cases from various jurisdictions in which courts have diverged on the question whether or not a college is a school. The Court notes that these courts interpreted statutes with language different from the ordinance in this case. The parties have also presented the Court with various statutory definitions of the term "school" that are in conflict. Various dictionaries also diverge on the issue.

Despite the general ambiguity of the term, the Court finds under the various applicable principles of statutory construction that Howey's legislative authority did not intend the term "school" to include colleges in Section 6(1)(A)(2). The term "school" in Section 6(1)(A)(2) is a general term followed by a series of specific types of schools. Under the doctrine of *expressio unius est exclusion alterius*, the Court finds that the enumeration of specific types of schools in Section 6(1)(A)(2), implies the exclusion of other specific types of schools that were not mentioned. These other specific types of schools cannot be included under the general term "school." Therefore, even if this Court considered a college to be a school, that was not the intent of the legislature that promulgated Section 6(1)(A)(2).

Furthermore, under the doctrine of *noscitur a sociis*, the specific types of schools following the general term "school" narrow the meaning of the general term. Thus, the meaning of the word school in context is restricted to those types of schools enumerated. Because a college is not one of the specific types of schools enumerated, it is excluded.

Finally, under the doctrine of *ut res magis valeat quam pereat*, a construction that included unenumerated specific types of schools like colleges, would render the inclusion of specific types of schools like elementary and high schools unnecessary to the statute and, therefore, meaningless. Because a college is at best a specific type of school, even if the Court found that a college could be a school, that was not the intention of the legislative authority in enacting Section 6(1)(A)(2).

The Court disagrees with plaintiffs' argument that because Howey's zoning regulations are in derogation of Desisto College's private rights of ownership they should, therefore, be interpreted in favor of the property owner. Although plaintiffs have articulated a valid principle of statutory construction, that principle will not be applied where legislative intent to the contrary is clear. *See Hoffman v. Brevard County Board Of Commissioners*, 390 So. 2d 445, 446 (Fla. 5th DCA 1980). Based on the foregoing analysis of legislative intent, the Court finds that legislative intent is clear and that the Court need not construe the ambiguity in the term "school" in Section 6(1)(A)(2) in plaintiffs' favor.

The Court also disagrees with plaintiffs' argument that the exclusion of "correctional institutions" from Section 6(1)(A)(2) indicates a legislative intent that the term school is broad enough to include colleges. To the contrary, the exclusion of correctional institutions is a further refinement of the specific types of schools. This Court agrees with defendants' suggestion that the exclusion is intended to exclude reform schools which are either elementary, high, or private schools. The exclusion was not intended to broaden the meaning of the term school or otherwise cause the term school to include colleges. Accordingly, the Court will deny plaintiffs' motion for summary judgment as to Count V and grant defendant's motion for summary judgment as to Count V.

### B. Facial Challenge Of Ordinance 160 For Vagueness

The standards for evaluating the vagueness of a statute or ordinance were enunciated in *Grayned v. City Of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). First, a person must be given a reasonable opportunity to know what the law prohibits so that

he may act accordingly. *Id.* Second, in order to prevent arbitrary and discriminatory enforcement, laws must provide explicit standards. *Id.* These standards should not, however, be mechanically applied, because the degree of vagueness tolerated by the constitution "depends in part on the nature of the enactment." *Hoffman Estates v. Flipside, Hoffman Estates Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Economic regulation is subject to a less strict vagueness test. *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). Moreover, laws which contain only civil penalties, are also given greater tolerance. *Barenblatt v. United States,* 360 U.S. 109, 137, 79 S.Ct. 1081, 1098, 3 L.Ed.2d 1115 (1959). The speculative danger of arbitrary enforcement does not render an ordinance void for vagueness in a preenforcement challenge to the law. *Hoffman Estates,* 455 U.S. at 503–04, 102 S.Ct. at 1195–96.

■ A "facial" challenge is a claim that the law is "invalid in toto—and therefore, incapable of any valid application." *Hoffman Estates,* 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5 (*quoting Steffel v. Thompson,* 415 U.S. 452, 474, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974)). On review of a statute for facial constitutionality, a federal court must consider limiting constructions that state authorities have proffered. *Hoffman Estates,* 455 U.S. at 494 n. 5, 102 S.Ct. at 1191 n. 5 (*citing Grayned v. City of Rockford,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300, 33 L.Ed.2d 222 (1972)).

■ Plaintiffs argue that Ordinance 161 is unconstitutionally vague on its face.[17] Defendants argue that the statute is not unconstitutionally vague because Howey's Comprehensive Development Plan is incorporated by express reference in Ordinance 161 and is also necessarily applied in any zoning decision pursuant to Fla.Stat. § 163.3194. Similarly, defendants argue that Howey's Comprehensive Development Plan requires that its standards be applied in enforcing each and every ordinance. Defendants argue that Florida courts have

approved the incorporation of a town's comprehensive plan by reference in an ordinance and that such ordinances will not be considered vague. *See Alachua County v. Eagle's Nest Farms, Inc.,* 473 So.2d 257, 261 (Fla. 1st DCA 1985).

Plaintiffs respond that the ordinance does not incorporate the Comprehensive Development Plan by reference. Plaintiffs argue that the only reference to the plan in the ordinance is one that requires the Director of Planning, or other person designated by the Town Council to "check compliance with the Comprehensive Development Plan." Plaintiffs argue that this cannot be construed as a requirement that applicants for a Public Facilities District designation comply with the Comprehensive Development Plan. Plaintiffs apparently concede that if the Comprehensive Development Plan is incorporated by reference, that ordinance provides adequate standards to give it fair notice of what the law requires.

The Court finds that Ordinance 161 incorporates the Comprehensive Development Plan by reference. First, if the Director of Planning is to "check compliance" with the Comprehensive Development Plan, failure to comply would *a fortiori* require denial of the application. Unless such compliance is deemed a mandatory requirement of the Ordinance, the legislature's inclusion of the language in the ordinance would be rendered meaningless. Such an interpretation should be avoided. Second, the ordinance should be interpreted so as to make it constitutional. If incorporation of the Comprehensive Development Plan is a reasonable interpretation and such incorporation renders the ordinance constitutional, it is incumbent on this Court to make such an interpretation. Third, as an economic regulation with only civil penalties, the ordinance must be given greater tolerance. Fourth, the Court finds that the possibility of discriminatory enforcement judged only from the face of the ordinance is speculative. Finally, this Court finds that the ordinance is capable of valid application

**17.** *See supra* note 11 for the full text of Ordinance 161.

and that the limiting constructions proffered by state authorities render the statute constitutional. Accordingly, the Court will deny the plaintiffs' motion for summary judgment on Count IV and grant defendant's motion on that count.

### C. Equal Protection Claims

The equal protection clause of the fourteenth amendment mandates that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This provision requires that "similarly situated" persons receive equal treatment from the government. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) (*citing Plyler v. Doe,* 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982)).

■■■■ If a person challenges a state created classification under the equal protection clause and the classification does not affect "fundamental rights" or use a "suspect classification," a federal court must presume that the classification is valid, and uphold the classification if it is rationally related to a legitimate state interest.[18] *City of Cleburne* 473 U.S. at 440, 105 S.Ct. at 3254; *Plyler v. Doe,* 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982). Rationality review has been described as "lenient." *Exxon Corporation v. Eagerton,* 462 U.S. 176, 195, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983). In conducting this analysis, federal courts must keep in mind that states are accorded wide latitude in regulating their local economies, and they may make rational distinctions or classifications among persons "with less than mathematical exactitude."[19] *New Orleans v.*

*Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976); *Vance v. Bradley,* 440 U.S. 93, 108, 99 S.Ct. 939, 948, 59 L.Ed.2d 171 (1979); *Alamo Rent–A–Car v. Sarasota–Manatee Airport Authority,* 825 F.2d 367, 371 (11th Cir.1987), *cert. denied,* — U.S. —, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988). *See also City of Cleburne,* 473 U.S. at 440, 105 S.Ct. at 3254.

### 1. The Legitimate Governmental Purpose

■■■ As to the first prong of the equal protection review, whether or not a particular classification has a legitimate purpose, a court need not discover the actual purpose the legislature had for its actions. *See United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980); *see also Silver v. Baggiano,* 804 F.2d 1211, 1218–19 (11th Cir.1986); *United States v. Middleton,* 690 F.2d 820, 822–23 (11th Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1497, 75 L.Ed.2d 929 (1983); *Equity Group Holdings v. DMG, Inc.,* 576 F.Supp. 1197, 1205–06 (S.D.Fla.1983) ("The Court infers that the legislature means what it does not say, as well as what it explicitly has set forth in the laws it has passed"); *cf. Cleburne,* 473 U.S. at 448, 105 S.Ct. at 3258 (finding that special zoning requirement was not supported by "any rational basis").[20] It is enough if the legislation is supported by plausible or hypothesized reasons. *Fritz,* 449 U.S. at 179, 101 S.Ct. at 461. It is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *Id.* (*quoting Flem-*

---

**18.** The cases in this circuit have uniformly applied the rational basis test to equal protection challenges of municipal zoning ordinances and municipal disposition of applications for rezoning of property. *See Grant v. Seminole County, Florida,* 817 F.2d 731, 736 (11th Cir.1987); *Nasser v. City of Homewood,* 671 F.2d 432, 441 (11th Cir.1982); *Couf v. DeBlaker,* 652 F.2d 585, 588–90 (5th Cir. Unit B, 1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982); *Stansberry v. Holmes,* 613 F.2d 1285, 1289 (5th Cir.1980); *South Gwinnett Venture v. Pruitt,* 491 F.2d 5, 6 (5th Cir.), *cert. denied,* 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974); *Higginbotham v. Barrett,* 473 F.2d 745, 747 (5th Cir.1973).

**19.** In this circuit, the actions of local zoning authorities are considered legislative in character. *Grant,* 817 F.2d at 736; *Couf,* 652 F.2d at 588; *South Gwinnett Venture,* 491 F.2d at 7. Local zoning commissions are, therefore, not required to make findings of fact or state reasons for their actions, and their actions are entitled to the presumption of validity accorded to other state legislation. *Couf,* 652 F.2d at 588; *South Gwinnett Venture,* 491 F.2d at 7.

**20.** *See infra* notes 29–30 and accompanying text for a discussion of *Cleburne.*

*ming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)).

A court will, therefore, accept contemporaneous statements of legislative purposes, or, in the absence thereof, rationales constructed after the fact, as the actual purpose of legislative action, unless "an examination of the circumstances forces [the court] to conclude that [the plausible or hypothesized purposes] *'could not have been* a goal of the legislation.' " *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 463 n. 7, 101 S.Ct. 715, 723 n. 7, 66 L.Ed.2d 659 (1981) (*quoting Weinberger v. Wiesenfeld,* 420 U.S. 636, 648 n. 16, 95 S.Ct. 1225, 1233 n. 16, 43 L.Ed.2d 514 (1975)) (emphasis added); *Hancock Industries v. Schaeffer,* 811 F.2d 225, 237 (3d Cir.1987); *Christian Science Reading Room Jointly Maintained v. City And County Of San Francisco,* 792 F.2d 124, 124 & n. 2 (9th Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 953, 93 L.Ed.2d 1002 (1987); *Stern v. Tarrant County Hospital,* 778 F.2d 1052, 1060–61 (5th Cir.1985) (en banc), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986); *Shelton v. City Of College Station,* 780 F.2d 475, 484 (5th Cir.) (en banc), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986) (substantive due process); *Scott v. City of Sioux City, Iowa,* 736 F.2d 1207, 1216 n.11 (8th Cir.1984). *See also Alamo Rent–A–Car,* 825 F.2d at 372; *E & T Realty v. Strickland,* 830 F.2d 1107, 1115–16 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988) (Circuit Judge Kravitch concurring in part and dissenting in part).

A district court may not substitute its own judgment as to the wisdom or utility of legislative purpose for that of local legislatures. *See Minnesota v. Clover Leaf*

*Creamery Co.,* 449 U.S. 456, 469, 101 S.Ct. 715, 726, 66 L.Ed.2d 659 (1981) (*citing Ferguson v. Skrupa,* 372 U.S. 726, 729, 83 S.Ct. 1028, 1030, 10 L.Ed.2d 93 (1963)); *Alamo Rent–A–Car,* 825 F.2d at 370. A district court must instead require those challenging a legislative judgment as to the purpose of its action to "convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979) (*citing Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–41, 55 L.Ed. 369 (1911)). *See also Clover Leaf Creamery Co.,* 449 U.S. at 464, 101 S.Ct. at 724.

The foregoing standards for equal protection review apply not only to the actual zoning legislation passed by the local legislative bodies, but also to the administrative enforcement of the zoning laws in particular cases. *See Stern v. Tarrant County Hospital,* 778 F.2d 1052, 1056–58 (5th Cir. 1985) (en banc), *cert. denied,* 476 U.S. 1108, 106 S.Ct. 1957, 90 L.Ed.2d 365 (1986)[21]; *Shelton v. City of College Station,* 780 F.2d 475, 479–83 (5th Cir.) (en banc), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986) (substantive due process).[22] The United States Supreme Court as well as courts in this circuit have applied the legislative model of equal protection review of specific applications of zoning laws. *See, e.g., Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (legislative model applied to denial of a zoning change from single family to multiple-family dwelling); *South Gwinnett Venture v. Pruitt,* 491 F.2d 5, 7 (5th Cir.)

21. "The constitutional test for rationality of a legislative classification, whether the classes be distinguished in the test of the law or in its administration, is whether *any* rational decisionmaker could have so classified." *Stern,* 778 F.2d at 1056.

22. In *Shelton v. City of College Station,* the Fifth Circuit Court Of Appeals stated the rationale for adopting the legislative model in constitutional challenges to particular applications of zoning laws. The Court stated that any other approach

would require zoning officials to place greater emphasis on recording evidence and to increase their knowledge of the record evidence. Such a change would alter the structure of the state-created process for deciding zoning questions, and the role of local zoning officials "would change from that of deciding the best course for the community to adjudicating the rights of contending petitioners." *Shelton,* 780 F.2d at 480. This Court agrees with the Fifth Circuit Court Of Appeal that such a result is to be avoided.

(en banc), *cert. denied*, 419 U.S. 837, 95 S.Ct. 66, 42 L.Ed.2d 64 (1974) (denial of application for rezoning of building from part commercial, part residential to apartment zone). Accordingly, this Court shall consider the equal protection challenge to the enforcement of Section 6(1)(A)(2) of the 1967 Zoning Ordinance together with the passage of Ordinances 160, 161, and 162.

In equal protection review of local zoning decisions under the rational basis test, this circuit has recognized the legitimacy of various legislative purposes. One panel summarized some of these purposes as follows:

> The Supreme Court has recognized the key role that the zoning power can play in maintaining for citizens an acceptable quality of life. Zoning is the local community's most powerful weapon against a wave of commercialism that threatens to permeate not only the major thoroughfares but the quiet residential neighborhoods with their parks, trees, and children at play. Without the power to zone, every person would be at the mercy of the entrepreneur who chose to develop on the next corner. Zoning provides one of the firmest and most basic of the rights of local control.

*Stansberry v. Holmes*, 613 F.2d at 1288. The governmental purpose of preserving the residential character of a municipality has uniformly been considered legitimate. *See, e.g., Grosz v. City Of Miami Beach, Florida*, 721 F.2d 729, 738 (11th Cir.1983), *cert. denied*, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984).

▇ Plaintiffs conceded at oral argument and in their briefs that the ultimate issue in this case is whether or not Ordinances 160, 161, and 162, passed by Howey's local legislative body, and the enforce-

ment of Section 6(1)(A)(2) by Howey's Mayor and Chairman of the Zoning Commission against Desisto College, have a rational relationship to a legitimate governmental purpose. *See* Transcript Of Hearing On Motion For Summary Judgment [hereinafter "Tr."], filed November 30, 1988, at 3. At oral argument plaintiffs' counsel stated that it was plaintiffs' position that there was no legitimate governmental purpose served by these ordinances. Tr. at 7. Plaintiffs' counsel stated that the preservation of the residential character of Howey did not constitute a legitimate governmental purpose in this case but was merely a pretext for governmental action that was really as a matter of historical fact motivated by irrational fear and prejudice. Tr. at 10, 16, & 49.[23] Plaintiffs' counsel further stated that even if there were rational reasons and the ordinance were valid on its face, if plaintiff showed improper motive, then the Court would have to find for plaintiffs. Tr. at 5.[24]

At oral argument defendants stated that summary judgment was particularly appropriate in this case because of the vexatious nature of the lawsuit and the devastating effect the lawsuit has already had on a local government and its officials. Tr. at 24 & 31. Defendants stated that the town's ability to provide municipal services like zoning and a police force is threatened by the attorneys' fees from this litigation and the possibility of bankruptcy. Tr. at 24–25. Defendants argued that the existence of the DeSisto High School in Howey since 1980 demonstrates that the government and people of Howey did not have any irrational fears and prejudices against learning disabled students. Tr. at 27 & 32–33. Defendants further stated that they had no objections to the DeSisto Col-

---

23. Plaintiffs' counsel stated that "[t]he question is whether that factually is the right reason, whether the preservation of residential neighborhoods and the defendants' concerns as articulated in their brief about fraternity houses and the like are in fact true reasons." Tr. at 10. *See also* Plaintiffs' Appendix In Opposition To The Defendants' Motion For Summary Judgment, Appendix C; Plaintiffs' Memorandum In Opposition To Defendants' Motion For Summary Judgment, filed October 11, 1988, at 17 & 24.

24. The following exchange occurred between plaintiffs' counsel and the Court:

THE COURT: So what you're saying is there could be fifteen reasons, rational reasons, ... for an ordinance. It could be on its face valid, and if there was improper motive, then it would be discriminatory?

MR. MacLEISH: Exactly.

lege in Howey. The town even helped Michael DeSisto obtain a license from state agencies. *Id.*

Defendants voiced their objections, however, when the College began buying residential properties that were not adjacent to the DeSisto High School and converting them into dormitories, classroom, and administration buildings. Tr. at 27–28. Defendants paint the conflict not as a civil rights dispute, but a zoning dispute in which the financial interests of Michael DeSisto and Will Roberts are pitted against the tranquility of the town. Tr. at 27. Defendants state that Michael DeSisto seeks nothing less than to use the civil rights laws to exempt himself from following local Zoning Ordinances. Tr. at 29 & 32. Defendants state that the town properly acted in the interest of protecting the residential character of the town. Tr. at 30 & 37.

Defendants further argue that the two enforcement actions at issue in this case did not deprive the plaintiffs of any property rights. Tr. at 35. Defendants point out that no leases were produced and the unrebutted evidence shows that the lease on the Mansion property was denied for reasons other than the town's enforcement actions. Tr. at 34–35. Defendants further stated that no underlying tort was established in this case because as a matter of law the reasonable interpretation of ordinances cannot be tortious and does not shock the conscience. Tr. at 35. Finally, defendants argue that the challenged ordinances are facially neutral and of general application and, therefore, constitutional. Tr. at 35–37 & 40.[25]

The Court finds that statements by Howey government officials and residents of Howey in affidavits and in open legislative hearings both contemporaneous and subsequent to the enforcement of Section 6(1)(A)(2) of the 1967 Zoning Ordinance against Desisto College and the passage of Ordinances 160, 161, and 162, indicates an articulated purpose for the legislation and the enforcement of the legislation in this case.[26] In particular, the articulated purpose of the legislation and its enforcement is to preserve the residential character of Howey. Defendants have proffered other legitimate government purposes for the legislation and the enforcement actions, however, in light of the Court's disposition of this case, it is unnecessary for the Court to analyze these purposes.[27] It is enough that the defendants had one legitimate governmental purpose for their legislation and their enforcement actions.

Based on the record before the Court, the Court finds that there are no genuine issues of fact that Howey government officials had evidence before them from which they could reasonably find that preservation of the residential character of Howey was the purpose of enforcing Section 6(1)(A)(2) of the 1967 Zoning Ordinance against Desisto College and passing Ordinances 160, 161, and 162. The record shows that there are no genuine issues of fact that the following facts were before the legislators and enforcers of Howey's Zoning Ordinances and that the legislators and enforcers could reasonably conceive those facts to be true: 1) that college students drive automobiles; 2) that DeSisto College would have greater parking requirements than an ordinary residential owner of property; 3) that the movement of DeSisto College students and their automobiles would cause greater noise than would exist without the College being located in residential areas; and 4) that college use is a more intensive use of property than ordinary residential use.

Similarly, the Court finds that there are no genuine issues of fact that preservation

---

**25.** The Court need not address the question whether or not plaintiffs have established any genuine factual issues as to their deprivation of a property interest or the existence of an underlying tort in light of the Court's disposition of the case on other grounds.

**26.** *See supra* section I of the Background Facts.

**27.** In particular, defendants state that other purposes for the subject legislation and its enforcement is to protect the public health and safety, to control future growth. *See* Defendants' Statement Of Facts Responding To The Questions Propounded In The Court's Order Of November 21, 1988, filed November 28, 1988, at 23–37.

of the residential character of Howey "could have been" the purpose of their enforcing Section 6(1)(A)(2) against Desisto College and passing Ordinances 160, 161, and 162. It is undisputed that government officials and residents articulated this reason contemporaneous to the enforcement of Section 6(1)(A)(2) against DeSisto College and the passage of Ordinances 160, 161, and 162, as well as at the present time. However, even if the government officials did not articulate these reasons, the objective existence of these reasons, either after the passage or enforcement of the legislation, supports their actions. It is unnecessary for this Court to probe the minds of government officials to find their actual subjective motivations. *See supra* at Section V, C, 1.

Plaintiffs argue that the articulated purpose is not legitimate because it is a pretext for the actual purpose of the legislative action. Plaintiffs argue that the real purpose of defendants' enforcement of Section 6(1)(A)(2) of the 1967 Zoning Ordinance against Desisto College and the passage of Ordinances 160, 161, and 162 as a matter of historical fact, was defendants' irrational fear of and prejudice towards learning disabled students. Plaintiffs argue that evidence in the record creates a genuine issue of material fact about the actual purpose of the legislation and its enforcement in this case.

The Court will assume arguendo that plaintiffs have established that there is a genuine issue of fact concerning the actual purpose of the legislation and its enforcement in this case. Even given this assumption, however, the Court cannot find that such an issue of fact is material under Fed.R.Civ.P. 56.

Although plaintiffs have introduced evidence to indicate that purposes other than the preservation of the residential charac-

ter of Howey might have motivated certain individuals, such a showing is irrelevant to the inquiry of whether or not preservation of the residential character of a town is a conceivable legitimate purpose for legislation and enforcement of that legislation. A showing that various individuals were motivated by irrational fear and prejudice against learning disabled students does not create an issue of fact as to whether or not "the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker," *Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979) (*citing Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–41, 55 L.Ed. 369 (1911)); *Clover Leaf Creamery Co.,* 449 U.S. at 464, 101 S.Ct. at 724, or that the proffered purpose " '*could not have been* a goal of the legislation.' " *Clover Leaf Creamery Co.,* 449 U.S. at 463 n.7, 101 S.Ct. at 723 n.7 (*quoting Weinberber v. Wiesenfeld,* 420 U.S. 636, 648 n.16, 95 S.Ct. 1225, 1233 n.16, 43 L.Ed.2d 514 (1975)) (emphasis added). Absent such a showing, it makes no difference whether or not various individuals had a purpose other than the preservation of the residential character of Howey. So long as the record shows that the legislators and the enforcers of the legislation had evidence before them that can reasonably be conceived to be true and from which they could have discerned the proffered purpose for the their conduct, the Court cannot question the credibility of the persons who articulated or hypothesized that purpose. It is "constitutionally irrelevant whether this reasoning in fact underlay the legislative decision." *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (*quoting Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)).[28]

---

**28.** The policy against inquiries into the actual motivations of legislators is well established. Indeed, the Supreme Court has recognized that "ever since *Fletcher v. Peck,* 6 Cranch 87, 130–131, 3 L.Ed. 162 (1810), that judicial inquiries into legislative or executive motivation represents a substantial intrusion into the workings of other branches of government. Placing a

decisionmaker on the stand is therefore 'usually to be avoided.' " *Arlington Heights v. Metropolitan Housing Development Corporation,* 429 U.S. 252, 268 n. 18, 97 S.Ct. 555, 565 n. 18, 50 L.Ed.2d 450 (1977) (*citing Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971)).

Plaintiffs rely on *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985) for the proposition that governmental actions based on improper motives such as negative attitudes, fear and prejudice and by means which are pretextual, arbitrary and irrational, violate the equal protection clause as well as the substantive due process clause. *See supra* notes 23–24 and accompanying text; Plaintiffs' Appendix In Opposition To Defendants' Motion For Summary Judgment, Appendix C. Under *Cleburne* plaintiffs argue that courts must apply a more searching review than in the typical rational basis test.

This Court disagrees with plaintiffs' reading of *Cleburne*. The Supreme Court has not expressly created a new "enhanced rational basis" review as suggested by plaintiffs.[29] Although the Supreme Court stated that irrational motivations of government officials do not constitute rational grounds that can support legislation, the Court did not state that such irrational motivations alone would render an ordinance unconstitutional if the ordinance was otherwise supported by legitimate objectives. *Cleburne*, 473 U.S. at 448, 105 S.Ct. at 3258. Indeed, it appears that the Supreme Court applied its traditional rational basis review when it found that the zoning requirements in *Cleburne* were not supported by "any rational basis." *Id.; see also E & T Realty v. Strickland*, 830 F.2d 1107, 1115–16 (11th Cir.1987) (Kravitch, J., concurring in part and dissenting in part). *But see Brennan v. Stewart*, 834 F.2d 1248, 1258 (5th Cir.1988). This Court will not interpret *Cleburne* as changing the well-settled law of rational basis review *sub silentio*.

Even if *Cleburne* did create a new level of scrutiny, plaintiffs would still be incorrect in their rendition of the applicable legal standard in this case. Even in the case of heightened scrutiny, as is applied to ordinances alleged to discriminate on the basis of race, proof that a municipality was motivated in part by invidious discriminatory purpose would not necessarily require invalidation of the challenged classification. Such proof by plaintiff would serve only to shift the burden of proof to the municipality on the issue of causation of the alleged harm. *See Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977); *Mt. Healthy City School Dist. Bd. of Education v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977). To satisfy its burden of proof on the issue of causation, a municipality would need to show that it would have reached the same decision even had the impermissible motivation not been considered. *See Arlington Heights*, 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21; *Mt. Healthy City School Dist. Bd. of Education*, 429 U.S. at 285–87, 97 S.Ct. at 575–76. It is unnecessary for this Court to analyze this issue at the present time. This Court expressly makes no finding as to whether or not the defendants would have reached the same decision absent some alleged discriminatory motive.[30]

**29.** Apparently, this enhanced rational basis review is less searching than strict scrutiny, somewhat less searching than intermediate level scrutiny, and somewhat more searching than traditional rational basis scrutiny.

**30.** In any event, *Cleburne* is distinguishable from the instant case. The ordinance at issue in *Cleburne* both on its face and as applied drew a distinction between group homes for the mentally retarded and other congregate living facilities such as apartment houses, multiple dwellings, boarding and lodging houses, fraternity or sorority houses, dormitories, apartment hotels, hospitals, sanitariums, nursing homes and private clubs. The ordinances and the enforcement in this case do not draw such classifications among similar land uses based on the handicaps of those using the land. The challenged classifications in this case are between high schools and colleges and between colleges and various other intensive uses permitted in residential areas such as libraries, community centers, and police stations. Complaint ¶ 142. The Court finds that colleges are different enough from elementary and high schools in their potential size and function that a municipality may rationally distinguish among them in making zoning decisions. A municipalities' ability to distinguish among schools and colleges is not dissipated merely because the college happens to serve learning disabled students. The Court similarly finds that distinctions between colleges and other intensive uses of property such as libraries, community centers, police stations are also rational. Such clas-

### 2. Rational Relationship Between The Legislative Action And The Legitimate Governmental Purpose

[18, 19] After the court identifies a legitimate governmental purpose for the challenged legislative action, the second step of equal protection review requires the court to determine whether or not the legislative action is rationally related to that purpose. If the legislative determination that its action will tend to serve the legitimate purpose "is at least debatable," the challenge to that action must fail even if the court is presented with evidence of the absence of a rational relationship between the legislation and its legitimate purpose. *Clover Leaf Creamery Co.*, 449 U.S. at 464, 101 S.Ct. at 724 (*quoting United States v. Carolene Products Co.*, 304 U.S. 144, 153–54, 58 S.Ct. 778, 784–85, 82 L.Ed. 1234 (1938)); *Hancock Industries v. Schaeffer*, 811 F.2d 225, 238 (3d Cir.1987). Where there was evidence before the legislature reasonably supporting the classification, a litigant may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken. *Clover Leaf Creamery Co.*, 449 U.S. at 464, 101 S.Ct. at 724. The Constitution provides such limited judicial review of social and economic legislation because it presumes that unwise decisions will eventually be rectified by democratic processes. *Cleburne*, 473 U.S. at 440, 105 S.Ct. at 3254.

Plaintiffs' counsel stated at oral argument that it was not even fairly debatable that enforcement of Section 6(1)(A)(2) of the 1967 Zoning Ordinance against Desisto College and the passage of Ordinances 160, 161, and 162 were rationally related to the preservation of the residential character of Howey. Tr. at 14. Plaintiffs' counsel argued that as a factual matter the exclusion of Desisto College could only have been related to the irrational and prejudicial purpose of excluding learning disabled students from Howey and no other purpose. Tr. at 15–16. Plaintiffs' counsel further argued that legislation that permitted elementary schools, high schools, and other more intensive uses but which excluded colleges was not rationally related to preserving the residential character of Howey. Tr. at 8–9. Similarly, plaintiffs in their memoranda stated that the enforcement of the zoning laws against Desisto College, while at the same time failing to enforce the zoning laws against other persons, was not rationally related to preservation of the residential character of Howey. Plaintiffs Appendix In Opposition To Defendants' Motion For Summary Judgment, Appendix E.[31]

The parties do not dispute that the enforcement of Section 6(1)(A)(2) of the 1967 Zoning Ordinance creates a classification between college use and elementary and high school use. The issue before the Court is whether or not there are any issues of fact as to whether or not it is fairly debatable that this classification and the enforcement of this classification against Desisto College is rationally related to the legitimate purpose of preserving the residentially zoned areas of Howey.

The Court finds that there are no genuine issues of fact as to whether or not

---

sifications fall within the category of social and economic legislation traditionally within the state's police powers and local zoning powers. *See infra* at Section V, C, 2.

The cases other than *Cleburne* on which plaintiffs rely are similarly distinguishable in that they all concern local ordinances that both on their faces and as applied make classifications between congregate living facilities that serve persons with various handicaps and similar living facilities that do not. *See Sullivan v. City of Pittsburgh, PA.*, 811 F.2d 171 (3d Cir.1987); *J.W. v. City of Tacoma, Wash.*, 720 F.2d 1126 (9th Cir.1983); *Burstyn v. City of Miami Beach*, 663 F.Supp. 528 (S.D.Fla.1987).

**31.** Plaintiffs have for some reason been reluctant to characterize their equal protection claim as one for selective enforcement. Tr. at 48. The Court finds plaintiffs' reluctance at using the words "selective enforcement" somewhat confusing. This Court interprets Count VI and especially ¶ 142 to allege a claim that the town enforced its ordinances against DeSisto College but not other landowners in the town. Such a claim at least in part sounds like selective enforcement. Whether or not the Court characterizes the equal protection claim as selective enforcement, the Court finds that the parties with whom plaintiffs compare themselves are not similarly situated as a matter of law. *See* text *infra* at text following note 32.

colleges are intensive uses of property. DeSisto College contemplates the establishment of classrooms, dormitories, faculty housing, administrative offices, a library, day-care facilities for faculty, a testing lab, a computer center, a visual arts studio, a gymnasium, laboratory space, a dance studio, a student services center, and therapy-related facilities. By virtue of its function and layout, DeSisto College causes greater movement of persons and automobiles than ordinary residential owners of property in Howey. DeSisto College also has greater parking requirements than ordinary residential owners of property in Howey. Parking requirements and the movement of persons in residential areas would grow as the College increased in size to its projected size of 160 students. Such movement of persons and automobiles must by necessity cause greater noise than would otherwise exist in residential areas. Even if DeSisto College did not intend to perform all the functions commonly performed by colleges, it *could* do so if it were permitted to perform college uses in residential areas of Howey. Accordingly, there are no genuine issues of fact that it was at least fairly debatable that the legislation and its enforcement against Desisto College was rationally related to the purpose of preserving the residential character of Howey.

The Court finds it to be of no consequence that other more intensive uses were permitted to exist in residentially zoned areas or that the zoning authorities failed to properly enforce their own laws against other zoning violators. As long as it is fairly debatable that a classification is rationally related to the legitimate goal, preserving residential areas, government officials are free to attack the perceived evil in a piecemeal fashion. Equal protection does not require that "all evils of the same genus be eradicated or none at all." *Railway Express Agency v. New York*, 336

U.S. 106, 110, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949). *See also Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966).[32]

Even if the Court had to analyze the town's failure to enforce its Zoning Ordinances against other persons in Howey, the Court would find that there are no genuine issues of fact that these persons are not similarly situated to DeSisto College. The ordinances and the enforcement in this case do not draw classifications among similar land uses based on the handicaps of DeSisto College's students and the absence of such handicaps in others using the land. The challenged classifications in this case are between elementary or high schools and colleges, and between colleges and various other intensive uses permitted in residential areas such as libraries, community centers, and police stations. *See* Complaint ¶ 142.

■ The Court finds that there are no genuine issues of fact that a rational lawmaker may determine that colleges are different enough from elementary and high schools in their potential size and function that a municipality may rationally distinguish among them in making zoning decisions. A municipality's ability to distinguish among schools and colleges is not dissipated merely because the college happens to serve learning disabled students.

■ The Court similarly finds that there are no genuine issues of fact that a rational lawmaker may distinguish among colleges and other intensive uses of property such as libraries, community centers, and police stations. A municipality may properly balance its estimation of the public need for certain facilities against the effect of those facilities on the town's residential character in making zoning decisions. A municipality for example may rationally determine that a police station is

---

**32.** In rejecting a constitutional attack on an allegedly underinclusive statute the Supreme Court stated:

[W]e are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' that a legislature need not 'strike at all

evils at the same time,' and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind.'

*Katzenbach v. Morgan*, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966).

necessary in a residential area in order to support the public safety. A library may rationally be determined to be necessary to serve the community's need for access to books. A community center may serve recreational functions. The municipality may without being irrational or inconsistent with the determinations just mentioned determine that a college in a residential area does not serve similar public functions, and that the ill effect of a college on the town's residential character and tranquility require exclusion of colleges from residential areas. Such classifications fall within the category of social and economic legislation traditionally within the state's police and local zoning powers. It is not for the federal courts to make such decisions for local zoning officials.

### D. Substantive Due Process

■ The due process clause of the fourteenth amendment provides that "[n]o State shall ... deprive any person of life, liberty property, without due process of law." U.S. Const. amend. XIV. The due process clause, in addition to setting procedural minima for deprivations of life, liberty, or property, bars "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). Under the doctrine of substantive due process, various portions of the Bill of Rights have been incorporated into the fourteenth amendment's limits on the power of the states as being "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). In addition, under substantive due process courts have invalidated laws or actions of government officials that "shock the conscience." *See United States v. Salerno,* 481 U.S. 739, 746, 107

S.Ct. 2095, 2101, 95 L.Ed.2d 697, 708 (1987) (*quoting, Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952)). Finally, the due process clause requires that states act only through means rationally related to legitimate ends and thus not "arbitrarily." *See Regents Of University of Michigan v. Ewing,* 474 U.S. 214, 227, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (dismissal of student from medical program did not violate due process clause as arbitrary); *Exxon Corp. v. Governor Of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213–14, 57 L.Ed.2d 91 (1978); *Williamson v. Lee Optical Of Oklahoma,* 348 U.S. 483, 491, 75 S.Ct. 461, 466, 99 L.Ed. 563 (1955). The analysis of substantive due process for rationality is the same as the analysis under equal protection review. *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 470 n. 12, 101 S.Ct. 715, 727 n. 12, 66 L.Ed.2d 659 (1981); *Exxon Corp. v. Governor Of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 2213–14, 57 L.Ed.2d 91 (1978); *Ferguson v. Skrupa,* 372 U.S. 726, 730–33, 83 S.Ct. 1028, 1031–32, 10 L.Ed.2d 93 (1963); *Brennan v. Stewart,* 834 F.2d 1248, 1257–58 (5th Cir.1988).

Plaintiffs do not argue that defendants' actions shock the conscience or that their right to operate in Howey is implicit in the concept of ordered liberty. Plaintiffs argue that the defendants' actions were not rationality related to the achievement of any legitimate purpose. Based on the Court's analysis of the equal protection claim, the Court shall for the same reasons reject the plaintiffs' substantive due process argument.[33]

Accordingly, it is

ORDERED:

1. That the Motion Of The Plaintiff, Desisto College, Inc. For Partial Summary Judgment, filed May 18, 1988, is denied.

---

**33.** Just as the foregoing analysis requires summary judgment in favor of the town, it requires summary judgment in favor of the individual defendants. The Court would add, however, that plaintiffs' claims against the individual defendants would fail regardless of the town's liability. Plaintiffs have failed to establish that injunctive relief against the individual defendants in their personal capacities is permitted

under § 1983. *See Akins v. Board of Governors Of State Colleges & Universities,* 840 F.2d 1371, 1377–78 (7th Cir.1988), *vacated on other grounds,* —— U.S. ——, 109 S.Ct. 299, 102 L.Ed.2d 319 (1988). Furthermore, if such relief were permitted, there would be a substantial question whether or not the defendants are protected by qualified immunity. The Court need not address these issues.

2. That the Motion Of The Plaintiff, De-sisto College, Inc., For Partial Summary Judgment On Count V Of The Fourth Amended Complaint, filed July 22, 1988, is denied.

3. That Defendants' Motion For Summary Judgment, filed on September 22, 1988, is granted.

4. That the Clerk of Court shall enter judgment for the defendants and against the plaintiffs.

DONE AND ORDERED.